Good morning, everyone. Good morning. Be seated. All right. The first case this morning is number 151456, Accorda Therapeutics against Mylan Pharmaceuticals. Mr. Clement, please proceed. We appreciate the first two cases overlap. We'll take them as they come. Thank you, Your Honor. It may please the Court. There are, as you indicate, two related cases today, and there are also two important issues presented by those cases, one of general jurisdiction and one of specific personal jurisdiction. With the Court's indulgence, I'll start with the first of those two issues. The Supreme Court, in its Daimler opinion, is— Can you start with the specific jurisdiction just to reflect at least the way I'm thinking about this case? Sure. So the reason there's a case of controversy in this artificial act of infringement—I want you to tell me why what I'm thinking is incorrect—is that Congress has reasonably determined that the filing of an ANDA application has a close enough causal connection to the only thing that will actually harm the Pioneer Drug Company, which is the actual ultimate competition. You undisputedly plan to compete directly or indirectly in Delaware. Why isn't that enough? Well, it's not enough, Your Honor, I think, because plans, future intents are not enough to support specific personal jurisdiction right now. Why not? I mean, it seems to me either they're not enough for there to be an Article III case of controversy or they're enough to support specific personal jurisdiction. I don't think that follows, Your Honor, and I think that if your logic actually were correct, there wouldn't be any need for Congress to create the artificial act of infringement that is the filing of the paragraph. That seems to me to be not true. And one aspect of Congress's power to create a case of controversy that wouldn't otherwise exist has to do not with the injury in fact element, but with the attenuation of the causal chain. That's what the Supreme Court said in the Massachusetts EPA case. We've said that, I think, a couple of times recently in Apotex and earlier Sando's case. Congress can, in fact, take a causal chain that might otherwise be too attenuated and say, no, this is close enough. Why isn't that what Congress has done here so that Mylan, by filing an and application, has sufficiently announced its intent to compete in Delaware? Well, I don't think that's what it's done. It certainly hasn't announced any greater intent to compete in Delaware than in any other jurisdiction in the country. So why isn't there a specific jurisdiction anywhere? Well, I think that's a sufficiently jarring conclusion right there to make me at least have some pause to think that there's actually a specific personal jurisdiction in all 50 states. And I also think with all... Isn't it true, though, even if you could argue that the act of infringement, because you've sought approval to act in every single state, that that wouldn't necessarily translate to in every state because you still have the overlay of the reasonableness analysis that has to be done? Well, I mean, I suppose that's true. But I guess what I'd like to say is I think the logic of this argument... First of all, if there's... You've got to get over the minimum context-specific availment prong before you even get to substantial justice and fair play. And so I think the problem is if there is jurisdiction in any jurisdiction because of the act of filing the ANDA, it would logically be in Maryland. Now, this court's Zeneca decision is an obstacle to that, to be sure, and I'm happy to talk about that. But we haven't purposefully availed ourselves of Delaware at all. And with all due respect to Your Honor, I think there is a problem with the analysis that you're parsing it true because, I mean, you obviously have thought about this and you put it in terms of intent to compete. But that's certainly not the way my friends on the other side talk about it. I think they talk about it the way you would more logically talk about it with all due respect, which is they talk about this future act of infringement that will take place in Delaware. But, of course, the whole design of the Hatch-Waxman Act is actually to prevent there from being an infringing sale in Delaware. And if there is an infringing sale in Delaware in the future, then... something that has not yet occurred as long as it is sufficiently planned and directed to the place. That is, you can have injunctive actions to prevent harm that is going to be directed into the state, right? Specific personal jurisdiction isn't limited to retrospective relief for already occurring harm. I would certainly concede that, Your Honor, but I don't think there's any support for the proposition that purely future acts that may or may not take place. And it's also worth taking into account here that once you file the Paragraph 4 certification and the ANDA, there are a lot of different off-ramps, if you will, that may prevent you, may prevent a generic company from ever marketing the drug in any state, let alone a specific state. Can you explain why there's a case or controversy in the absence of a sufficient likely connection to the future competition? I mean, you get an FDA approval. It makes nothing happen. It doesn't affect them one bit unless there's an actual likelihood that you're going to use it, right? Well, I think... I'm not sure that's right. Which is to say, I think that once we call into question the validity of the patent, that there may be enough there to get you over the Article 3 minimum without regard to contemplating how that is going to be implemented in a marketed product. Because, I mean, if we get the invalidation of their patent, I mean, I think they've suffered an injury. I'm sorry, but you don't get an invalidation unless you get into court. So what is it that gets you into court? There must be a case or controversy. There must be... You must be threatening an injury in fact. And I guess I'm having a hard time understanding what that is other than the competition that you will bring to bear once you use the approval. I think it's the threat to their patent. I think that's sufficient to get you over the minimum Article 3. Is it your position that Hatch-Waxman, by creating this artificial act of infringement, is simply... That that provision is simply giving rise to a cause of action as opposed to an actual act of infringement? Well, it's a bit metaphysical, I guess. I mean, which is to say, it's a highly artificial act of infringement. It is, I think, necessitated by Congress's reality that just by filing it, we haven't actually threatened a future sale in all 50 states. I think if that were the case, you wouldn't even need to treat the Paragraph 4 filing as this artificial act of infringement. You just contemplate the thousands of infringement actions that could eventually be contemplated. I don't think that's the way anybody's ever thought of the filing of the... No, but is it the whole... Of course you need the artificial act of infringement because you... Allow a resolution before the actual commercial sale, right? Exactly, Your Honor, exactly. But the problem is they had to do that because they protected all the prior activity that would have been subject to an infringement action. Absolutely, and they don't want to put... They want to encourage generics, not discourage them, so they don't want to put them in the position that by doing the contemplation and the actions that would be necessary in advance of the Paragraph 4 certification, that they then are in a position where they've already infringed. Well, you're not presenting the case, which would really be, I think, unique in Hatch-Waxman litigation, that there is not an act of infringement, whether you call it artificial or statutory or anything else. Hatch-Waxman provides this is an act of infringement. You have an obligation to file suit within a relatively short period of time or else schools out. And so it seems to me that what I hear you saying is that despite what I think is undisputed, that there is an act of infringement, there is neither specific nor general jurisdiction in Delaware. Absolutely, Judge Newman. That is our humble point. I mean, I'm trying to be responsive to Judge Toronto's line of questioning. But I do think when we file the Paragraph 4 certification, I do not think the right way to think about that is that that is in any way directed at Delaware. Why should the forum be chosen any differently in this case? You aren't disputing that there'd be jurisdiction in the state of incorporation. No, there's clearly jurisdiction in West Virginia, which is where my client is incorporated. And that one should disregard acts or at least the consideration of acts that otherwise could very well be relevant to specific jurisdiction? We're not asking for a special rule. We just don't think there are any other specific acts directed at Delaware that are jurisdictionally relevant. But it's your position that there is no specific jurisdiction anywhere, correct? No, I don't think that actually follows, Your Honor. I think actually, I mean, I think the logical place where there also could be specific personal jurisdiction is where the ANDA is prepared. Well, how could that be when those acts are protected by statute from claims of infringement? Well, I still think, well, they are protected, but I still think they are jurisdictionally relevant acts. So I think if, for example, you know, Milan has, you know, its headquarters is in West Virginia, but it has offices in Pennsylvania. If it, contrary to the facts of this case, had prepared the ANDA in Pennsylvania, I think there might be a good argument that there would be specific personal jurisdiction over my client in Pennsylvania. Here, I don't take issue that there is... So you think all the prefiling activity would be relevant jurisdictionally, even if not relevant, even if not enough to create a cause of action? Yeah, I think that's right. Even immunized activity, I think, can be relevant for specific personal jurisdiction. So even if you want to think about it in the strongest form, that those prefiling acts are immunized from liability, I think they're still relevant for the specific personal jurisdiction analysis. And does it remain your view that Milan was right in Zeneca to argue that there is no active infringement in the state of Maryland? I do think that's right. I think that's right for reasons that are kind of unique to the fact that there's a in Maryland. Of course, if the other side's right, and if Judge Toronto's theory is right, then the Zeneca decision's actually wrong, or at least just missed the obvious reason why there actually is specific personal jurisdiction, or at least minimum contacts with Maryland, which is, under their theory, there's specific personal jurisdiction in all 50 states. Can I ask you, I guess, as a non-legal question, either in your own ANDA filings, or more generally under FDA regulations or whatnot, does an ANDA applicant declare in any way an intent to use the approval being sought to enter a market? I'm not 100% sure. I'll try to get you an answer to that, but I'm not 100% sure. It's not obvious to me why that's a statutory requirement, but I don't want to give you an answer that I'm not prepared to give. I understand that these circumstances are unique because of the structure of Hatch-Waxman, but do you have any... I didn't see any cases cited for the proposition that exempt acts can be jurisdictionally relevant. I don't know that the question had specifically come up with... I didn't really view it as a part of my friend's on the other side's argument, so I don't know that we've really specifically looked into the question in that way. I really don't see any reason why that wouldn't be true, and I've looked at a lot of personal jurisdiction cases, and there's just nothing in those cases that suggests that whether your act is itself immune or exempt, that somehow that makes it jurisdictionally irrelevant. I think what the court's cases, and particularly if we're talking about specific personal jurisdiction after Walden, make clear is that it's the defendant's contacts with the forum that matter, and that's why in answer to Judge Newman's question, I don't view us as asking for any special rule here whatsoever. It's just that the logic of the district court opinions here is that because we provided the statutorily required notification to companies that are headquartered in Delaware, that somehow we therefore should have known that we would be liable to suit in Delaware. Those weren't their only conditions. We'll hear from Mr. Olson, but I think he will tell us that there are many contacts with Delaware that ought to provide specific jurisdiction. Well, Judge Newman, I'll listen for those as well, because what matters is not just contacts with Delaware, but they are the defendant's litigation-related contacts with Delaware, and that's what's missing in this case, because they're located in Delaware. In this case, we filed the statutorily required notification letter in New York, but to a Delaware corporation, so they're located in Delaware. They have some ongoing suits against other generics in Delaware, but again, that's their contacts, not our contacts. And then with respect to Delaware more generally, I'm not here to tell you, at least through distributors, that we do no business in Delaware, but that's not suit-related contact. And so with respect to suit-related contacts of the defendant in Delaware, I dare say they come pretty close to the null set. But doesn't that take us back to cases like Beverly Hills Fan and many of the general cases that look to the specific facts of the particular relationship with the forum and then the fairness of suit in that forum and the specific situation? Absolutely, Your Honor, but in Beverly Hills Fan, you actually had the company was selling the product in Virginia at the time, the relevant product in Virginia. That's not happening here. The other thing, at least as I read the court's opinion, that was really driving the analysis in the Beverly Hills case is that there was no other obvious forum for that litigation, and that is not a problem we have here. There is a pending suit in West Virginia. We admit to personal jurisdiction in West Virginia, but that's where the suit should be brought. But what I'm really trying to think through is the uniqueness of Hatch-Waxman and its artificial premises and whether, in fact, we know that since that relates to the entire structure of present-future infringement, that we do need to look at how future plans might affect jurisdiction. Well, two things, Your Honor. One is that, and I think this would be common ground among all the parties, I mean, Congress and the Hatch-Waxman can't trump the defendant's personal jurisdiction's rights. So even if it would be convenient in Hatch-Waxman litigation to continue the status quo ante, which was general jurisdiction cases being filed in Delaware, even if that's convenient, that can't trump my client's rights. But second, and I think most important, Congress thought about this, at least if you look to legislative history. And in the House report that's at page 10 of the generic pharma brief, Congress had a solution in mind to this, which is you'd use the normal means of consolidating litigation and multi-district litigation to deal with these problems. There's nothing so unique about Hatch-Waxman. The committee report talked about that, but there's nothing in the statute that says that that's the only mechanism. No, I agree. But, I mean, you know, to those that look to committee reports, that committee report is much more directly on point than anything on the other side of this case, and it does seem to me quite telling that Congress, when it thought about this, didn't say, well, of course we're going to have a super court somewhere. And, you know, by the way, if you're going to have a super court somewhere, I think more logically it would be Maryland, not Delaware. I mean, why Delaware? Let me ask you this. In response to Judge Toronto, you said that the case of controversy is created because you've attacked the validity of the patent by the filing. Now, why isn't that akin to the defamation that occurs in Calder and that you would apply the effects test? Why doesn't that put you closer to Calder than it does to Walden? Well, I really think after Walden, Calder is the exception and Calder is the general rule. And as I read the court's Calder, or rather read the court's Walden decision, what is so relevant there about the defamation tort at issue in Calder is that it is actually an element of the tort that there be third-party injury. But in Walden there was just fortuitous connection between the plaintiff and the defendant in another state that gave rise to the tort. Here, much like Calder, you knew full well who you were directing your paragraph for certification to. Oh, with all due respect, Your Honor, I think that is exactly the analysis that the Supreme Court rejected in the Walden case. Because remember, the Walden case, there were multiple claims, but the claim that the Ninth Circuit let go forward was not the claim for the unlawful seizure of the money in the airport in Georgia where the connection to Nevada was quite fortuitous. The claim that the Ninth Circuit allowed to go forward was the claim about the false affidavit that they alleged that the officer put in once the individuals were already back in Nevada. And the arguments, if you look at the footnotes in Justice Thomas's decision, the arguments that the plaintiffs made in Walden are exactly the same arguments that my friends on the other side are making here. They said, well, you had somebody who was in Nevada, the alleged tortfeasor knew they were in Nevada, and by putting in the false affidavit they were knowingly targeting somebody who was resident there. And the court, I think, cannot be more emphatic that it is not the plaintiff's connection with the forum that matters. What matters are the defendant's, my client's, litigation-related contacts with the forum, and those are just simply absent in this case. And to be sure, they're absent in part because of the nature of the Hatch-Waxman Act. I'll grant you that, and that might be a source of concern if there were no forum for this litigation. But there's a perfectly rational and available forum for this litigation, which is West Virginia, where I think there's both specific and general jurisdiction vis-à-vis my client. I see I'm over my time, so I don't know. Let's hear from the other side, and we'll work out the timing. Mr. Olson. Thank you, Your Honors. May it please the court. I will turn to the specific jurisdiction point, although I plan to turn to the general jurisdiction point, time permitting. Congress decided in this statute that there was a clear, present, immediate infringement. Congress passed a law that says that the ANDA itself and the Paragraph 4 certification constitutes infringement. I know the Supreme Court used the word artificial, but Congress used the word infringement. That triggered immediate, present harm. But why shouldn't we just look at that provision of the Hatch-Waxman Act as creating the cause of action, in other words, creating the artificial case of controversy, but not creating jurisdictionally relevant conduct? Well, I don't think there is such a thing as artificial case of controversy. There is a case of controversy because Congress decided that filing the ANDA and the Paragraph 4 certification in and of itself constitutes infringement. I'm sorry, I don't understand that. You said there's a case of controversy including an injury in fact, the most fundamental requirement of Article 3, simply because Congress put a label of infringement on something somebody did? Congress determines under the Constitution what constitutes infringement of a patent. Infringement is not an Article 3 word. What's the injury in fact? The injury is a threat to the validity of the patent held by my clients, the jeopardy that patents are put in as a result of the ANDA process that takes place. Congress called this… What stake does Mylan have in that question unless Mylan plans to take sales away from you? And that's exactly what Mylan plans to do. That is why the ANDA is filed. That's why the Paragraph 4 certification is. That's why the Supreme Court called this a provocation to litigation. It is a clear, present, right now infringement. The act of infringement, whether there are sales or not, the act of infringement threatens what Mylan owns in Delaware and other places where Mylan intends to sell this product. It's announced an intention. Do you know, by the way… Can I just ask you that same question I asked Mr. Clement? Is there some aspect of Mylan's filing or every ANDA applicant's filing that says, we intend to use the approval once you give it to us to market a drug? Well, that is the announced intention. That's the only reason why you would file the ANDA. That's the purpose for it. I'm trying to ask a very specific question. Do they declare that in the ANDA filing or someplace else? Not in so many words. It doesn't say we intend to do this and we'll do it no matter what. It seems awfully intuitive that that's why you would go to the trouble. I'm just asking a very specific question. And I'm answering that question by saying that the whole purpose of the statutory scheme to put this in play to cause an immediate, present threat. Now, in addition, of course, what Mylan has done is not only threatened to market the products in Delaware or other states, it is also registered to do business in Delaware. It is registered to sell, manufacture, and distribute products in Delaware. It is licensed to do business by the pharmacy board in Delaware. It is engaged in litigation in Delaware in some 50 cases. That all goes to the fairness issue. But I think that Mr. Clement would argue to you that you're missing the middle piece here, which is the acts related to the cause of action that occur in the state. So you have to say that either the act of infringement occurs within the state of Delaware or that we are allowed to look at potential future acts for purposes of establishing jurisdiction. And I submit both is true. Because Congress itself decided that the infringement takes place when the ANDA and the Paragraph 4 certification take place. What is an infringement? It's an invasion of someone else's rights. That invasion takes place, just like in the Calder case or in the Keeton case, where the defendant is going to be hurt, where the plaintiff is going to be hurt, will be hurt, is hurt by the publication, is hurt by the infringement. Wait, wait, wait. The infringement occurs where the plaintiff is going to be hurt? Is that what you said? The infringement is an invasion of the rights of the plaintiff. The plaintiff is in Delaware. The plaintiff is in other states as well, but the plaintiff is in Delaware. If you're going to infringe someone's patent, you're threatening their rights, you're undermining their rights, and you're doing that where that plaintiff lives. So are you saying that in a normal circumstance, say I'm a regional seller and I only sell in two or three states, that if I sell an infringing product in those states, that you then consume me in your home if it's in a different state just because that's where you own the patent? It may well be that under a subject to the fair and reasonable limitation that that's damage done to the owner of the product, and I think that's entirely consistent. But there are all these other factors that we've cited that's in the briefs. It's not just intending infringing sales. It's registration of due business. It's registration with the pharmacy board. It's past sales. It's litigation as a plaintiff and a defendant in Delaware. The purpose of the Hatch-Waxman Act is to facilitate this very litigation because the patent owner is hurt by the process itself. So the Hatch-Waxman Act is to give rise to litigation that can occur before the sales happen, right? Yes. But there's nothing in the Hatch-Waxman Act that says where the litigation is supposed to occur. That's correct. It does not say that, but it does say that the process creates an infringement when it is initiated by the defendant. Let me turn momentarily, while I still have time, to the general jurisdiction point because I think it's very fundamental. In 2010, Milan chose to register, to manufacture, distribute, and sell pharmaceuticals in Delaware, knowing full well that 22 years earlier the Delaware Supreme Court clearly and unambiguously held that doing so, as Milan did in 2010, would constitute consent to jurisdiction, general jurisdiction, in Delaware. The United States Supreme Court has held that such content is voluntary, constitutional, and effective to waive objections to general jurisdiction. Can I ask you this question, which maybe bears, or at least you argue about this in addressing, I guess it's the Chamber's argument about unconstitutional conditions, and I think both you and, I guess, AstraZeneca have what seemed to me to be all of one sentence that gets at the point, which says, well, of course Delaware has a strong interest in saying if you want to do business in our state, you must consent to be sued in our state on causes of action having nothing to do with our state. It's a sentence. It's a nice assertion. Tell me why that's so. Well, in the first place, this is an argument that was not raised by… I understand that. And under this court's jurisdiction in the Amoco case, if it's not briefed in the opening brief, it is waived. Tell me why Delaware actually has an interest in saying if you want to do business here, you have to be suable on causes of action that don't concern us. Well, I might say, first of all, I will answer that question, but first of all, the Supreme Court of the United States has already answered this in the Nearbolt case. It says this is in the nature of a contractual relationship. In order to do business here and to have access to our courts, you must consent to jurisdiction in our courts so that you not only have the right to participate and bring cases in our courts, but you have the responsibility and burden to be responsive in those courts to citizens bringing cases here. In the Nearbolt case, the Supreme Court said that's a contractual-type relationship. It is a voluntary decision by the party doing business, and it is constitutional. I think I understand the Supreme Court's due process cases on this point. Do you think that there's any daylight between that analysis and an unconstitutional conditions analysis? No, because this is not my colleague here would have raised that point had he thought that this was a nonconstitutional condition point. He didn't raise it. He didn't brief it. It's in one sentence, in a footnote in the reply brief. The Supreme Court has already decided in that connection, in the connection of registration to do business as consent to general jurisdiction in the Nearbolt case that it was constitutional. That is a precedent that's binding on this court. How is that different, though, than the fact that the state of Ohio was not allowed to say that as a condition of doing business in Ohio, you either have to consent to jurisdiction or you have to waive the running of the statute of limitations? And the Supreme Court said that was an undue burden on commerce. Yes, but this is a different situation. This is directly related and tied to the fact that you're being given the opportunity to participate in the courts of the state of Delaware. You do not have to register to do business. You do not have to do business in Delaware. Once you do, you do not have to register to do business in Delaware. There are consequences, and my colleague points this out in his brief. He says that you're going to provide an incentive for corporations not to do business in particular states or not to register to do business in particular states. It's right in the brief. So there's a voluntary choice here. You're entering commerce in the state of Delaware. A part of that bargain, as the United States Supreme Court put it in Nearbow, part of that bargain is your consent then to the burdens and making yourself available to suit. You're using our courts to bring suits. You're going to have to be responsive to people who bring suits against you in our courts. That's a reasonable transaction. That doesn't have anything to do with the statute of limitations or the removal case that is also mentioned in the briefs. This is a reasonable relationship. It's a reasonable exchange. The Supreme Court has already found that. The Supreme Court has also said in a number of cases that this is the personal jurisdiction, the right to personal jurisdiction is a right of personal liberty, and it is waivable. That's not contested. And then the Robert Mitchell Furniture case. If this is so important and so basic a principle, why is it that in Daimler they didn't begin with the question of whether or not Mercedes-Benz was registered to do business in California? The Daimler case specifically refers to the Perkins case and the Goodyear case as those cases said where there was not consent to do business. The Daimler case was focusing, and it was briefed and argued, the only reference in the argument in the Daimler case was a question by Justice Ginsburg saying, well, of course you can always consent to jurisdiction, and the government attorney, Deputy Solicitor General Needler, said yes, of course. That was the only reference in that case at all. The Supreme Court in Daimler specifically said, I can't remember the page number, but it specifically said, referring to the Perkins case and the Goodyear case, that those were cases where there had not been consent to jurisdiction. And the fact is that the Goodyear case is the very first case cited in the Daimler case, and Justice Ginsburg knew what she was talking about. She referred to the Goodyear case something like 15 times. I went through this yesterday, 15 times in the course of her opinion. She knew that Goodyear was a case where there had not been consent, and that case and the Daimler case refers to the Perkins case as a textbook case of general jurisdiction and minimal contacts where there had not been consent to jurisdiction. So we have a syllogism in a sense. There's no question that this is a personal right, no question that it may be waived. There's no question what Delaware law was very clear. The Robert Mitchell case makes clear that if the state makes it clear in a statute or by construction, then it is something that's clear, ambiguous, and available. It's a mile and two to consider. Twenty-two years after that decision, knowing that the decision had been made, knowing that this was a waivable right, it went ahead and waived those rights and petitioned, signed up to do business in Delaware knowing all of those things. So there's really no question about it. The cases by the United States Supreme Court that says that this is constitutional and constitutes consent to general jurisdiction cannot be overturned by this court, even if you were inclined to do so. I can't imagine that you would be. But those are binding on this court. Mr. Clement, in his brief, says those are holdings of the United States Supreme Court. Because he calls them discredited or archaic, it doesn't mean that they're not the law of the United States Supreme Court. That constitutes general jurisdiction. In addition to the strong points that support specific jurisdiction in these cases because of the way Hatch-Waxman Act is set up. So to be clear, to focus, is your primary argument that by consenting to suit in Delaware that that is a critical aspect in the total environment of the interactions and relations with Delaware that solves the jurisdictional issue? Well, my primary point are two, Your Honor. That there is unequivocal consent to jurisdiction. That should end it. And then with respect to specific jurisdiction,  with respect to whether there is litigation-related conduct by Mylan in Delaware. The invasion of the rights of a Delaware citizen, where Mylan has announced its intention to do something. The simple announcement under Hatch-Waxman Act is an infringement of the rights of this company. Mylan has been doing business in Delaware for a long period of time and has participated on Delaware court. All of those support specific jurisdiction in this case. So there are two points. It is clear that there is general jurisdiction, but it is also clear that there is specific jurisdiction in the context of this case with this plaintiff. Before you sit down, let me just ask your view with respect to our Zeneca decision. First of all, what precedential impact can those two opinions have? I mean, what is the holding that is other than the fact that in that case, there wasn't jurisdiction over Mylan in Maryland? Well, I think that it's precedential only with respect to the fact that the peculiar facts of the case, the government office in Maryland, and the issue that was also involved about petitioning the government and so forth. That case is certainly not precedent here because the facts are completely different. We're talking about different circumstances. So that case is not precedent. But would you agree that if your theory that the act of infringement occurs in any state in which approval is sought, that that would have meant that there was jurisdiction in Maryland? I think that the court, as I read the opinion, distinguished because the fact that it occurred in Maryland, but in the context almost like an enclave because it was the FDA's headquarters and that's where it had to be filed there. Well, that was one judge. Yes. And then there was another judge that said there was no act that occurred in Maryland. There couldn't be personal jurisdiction. Then the third judge just dissented without saying why. Okay. That's another reason why I think it's not precedent with respect to what we're talking about here today. It's not clear what was decided. There are a number of different potential grounds with respect to it. But the act of infringement, like the act of libel in the Calder case or the act of libel in the Keaton case, emanates out, does immediate damage to the person whose rights are being infringed, and that supports specific jurisdiction in those venues. I think there's another aspect that I found troubling and confusing from the beginning. In Hatch-Waxman, we've been talking about an artificial act of infringement. That really was not the premise of Hatch-Waxman. In Hatch-Waxman, what the generic was doing had already been established as an act of infringement. Hatch-Waxman said no preparing for the ANDA. You can do it, although it infringes according to precedent. It would infringe and does infringe, and as compensation for that. Also, you can join the issue of validity before the patent, before you are ready to market, so that you aren't stuck with four years in the courts before you can practice your ANDA. Now, these are different kinds, set of premises than what we have come to be talking about. We've been talking about the notice that is given after the Paragraph 4 certification as generating the opportunity to state an artificial aspect of infringement. Now, to proceed, and then we're sort of involved with how complex, how complete are the relationships. It seems to me that we're generating a house of cards, which really has nothing to do with the issues, which again takes us back to the specific facts of the extent of the relationship. Again, I mentioned Beverly Hills Fan earlier because it was a patent case, and therefore brought out all of the aspects of practice and distribution. Where it was manufactured, I think, was overseas and all the rest of it. So, where does that leave us? Does it leave us, as I had always thought, with the question of simply looking at the extent of the contacts? And again, where there is fairness, where there is due process, where there are sufficient contacts. Without all of the other things we've been debating. Yes, well, I think my answer to that would be, in the first place, that elides the general jurisdiction point where there's been a waiver and registration. But I think it's fair to say that Hatch-Waxman, in a sense, by taking these acts of infringement, the preparation, the testing, the trials, and that sort of thing, that would have been acts of infringement, saying, no, we're going to allow those to take place. The bargain is that then, when you're ready to do this, when you intend to move forward, those acts of infringement become ripe and material. When you file the ANDA and the Paragraph 4 certification, you're bundling all that together, and that, then, is the act of infringement that those other acts would have been. And then that is what you're doing. And why doesn't that support Mr. Kmetz's argument that then what you do is you look backward to where those acts of infringement actually occur for jurisdictional purposes? Because what I'm saying and what I think is a reasonable inference to be drawn from the statute itself and the picture that it presents is the act of infringement is doing damage to the patent holder. The act of infringement, by announcing this intention, and there shouldn't be any doubt that that's why. You don't have to say that, Judge Toronto, that I'm going to intend to do these things because you wouldn't be filing the ANDA if you did not intend to do it. And everything in the history of Milan and the facts of this case support the proposition that that intent was real, the threat was real, and the damage was done by the filing of the ANDA, which is an act of infringement, which hurts the patent holder, where the patent holder lives, and where the patent holder's products are going to be infringed if the process plays itself out the way Milan intends to play itself out. Well, that paragraph 4 certification was not put into the statute to benefit the patent holder. It was put into the statute to benefit the generic so that the issues, the threshold issues, the validity issues could be resolved while the patent is still pending. Yes, but it seems to me that it's put into effect so that this statutory scheme can take place, and as the Supreme Court put it, as the statute says, it's the act of infringement itself, but it's also the provocation of litigation. I think that's the words of the United States Supreme Court. It announces that you'd better do something. You'd better file a lawsuit. You are being provoked because this is about to take place, and you'd better defend yourself because if you don't defend yourself, these bad things are going to come to fruition, and those are going to be damaging. Those are going to be damaging where you've been selling your patented products and where you live and where you do business. So how does that affect where you can sue? It affects where you can sue in the sense that what I've been saying is that the injury that you caused, the infringement, it is not infringement. Infringement is not something that happens in a vacuum. It is actual harm itself, and it's harm to whom? It's harm to the patent holder. It's immediate harm, and Judge Taranto put his finger on this right at the beginning. If it isn't, we have an Article III issue about someone bringing suits where there's a threat and what the court might require in terms of concrete, immediate, tangible injury and so forth. Congress has already decided that for us. This is damage occurring right when those statutory events take place. And how do they play themselves out? They play themselves out in an invitation to come into court to get this resolved, and we submit that over and above or beyond the general litigation issue, the general jurisdiction issue, which we think is pretty clear-cut, this triggers a responsibility to take some action by the patent holder, and where is the patent holder hurt? Where the patent holder lives, where the patent holder has been successfully selling patented products, which the infringer or the generic wishes to intrude upon. And that last bit is everywhere on the assumption that Mylan will, in fact, erect its patent everywhere. There's nothing wrong with that because, as you point out, when they actually do start selling the product, those cases can be brought in those venues, in those jurisdictions. Okay. Thank you, Mr. Olson. Let's see. Mr. Klinit, you have some rebuttal time, and then the next case, do you want to put those in one after the other? Sure. But it would probably be helpful to me just, yeah, to know when they're going to switch at the table behind me and that sort of thing. I'm cognizant that I have some additional time. I would like to make three points in rebuttal if I could. The first is to just try to elaborate on an answer to a question to Judge O'Malley, which is, you know, as I had a moment to reflect there, I mean, I really am quite confident, though I haven't been able to do any legal research while I sat there, that immunized conduct can give rise to personal jurisdiction. And to give you just a for instance, I mean, imagine that the plaintiff in Walden had sued not just the sort of law enforcement agent, but the prosecutor who was involved in the preparation of the allegedly false affidavit and assume that Walden, as to that suit, actually brought it in the right forum and filed the suit against the prosecutor in Georgia. Now, I don't have any doubt that the prosecutor would enjoy absolute immunity and that suit would get dismissed on the merits based on an absolute immunity defense in a heartbeat. But I also have no doubt that there would be personal jurisdiction over the prosecutor for purposes of that suit, even though the relevant conduct was immunized. And that may be the way to think about this, which is to say that the reason there's not an Article III problem is because but for Hatch-Waxman, the very acts of preparing the ANDA would be an act of infringement that would give rise to Article III injury. And the way that Hatchman-Waxman- As you can imagine, I'm still not, I don't think I've heard an answer to the question, what injury, in fact, is there to them from your filing an ANDA on the assumption that you don't plan to use it? Well, on the assumption that we don't plan to use it- Yeah, so you're not going to sell. You just, you think- Well, suppose we're just- You know, like a lot of people with patents who want a FDA certificate on the wall. No, but- How do you feel about it? I mean, suppose I'm just planning on manufacturing it, and I'm planning on leaving the selling and the distribution entirely to other people. I still want the ANDA. My manufacturing activity, which may take place entirely in one state, is more than enough, I think, to give rise to an Article III injury. And I don't think then the right way to think about this is that once you have the ANDA filing, you have to then sort of predict exactly where we're going to end up filing. I mean, you know, you could have a generic company that for idiosyncratic reasons- But it doesn't seem to be very difficult here. I mean, you agree that you're doing this because you want to use the ANDA, and you have a widespread distribution network. But in particular, as to Delaware, you will direct your product into Delaware. Well, only if we prevail in the litigation, and at that point, the sales that we make won't even be infringing sales. And we haven't even sort of talked about this, but part of the conundrum I'm having is they seem to think the problem here is the ANDA anticipates infringing sales in all 50 states. But the one thing this whole process does is make it almost entirely unlikely there will be any infringing sales. If the allegations of their complaint are correct- Injury in fact here comes from the sales. With all due respect, I don't think that's right. It would come from the moment we manufactured. They have an infringement case, and of course you don't manufacture just to stockpile. How are they harmed? They are harmed because you are infringing their patent. I don't get what that is other than a set of words. What do they lose unless you sell or arrange with others to sell a product that causes them loss of sales? They lose their right to exclude that is inherent in the patent. I mean, let me give you a hypothetical. It's your job to give me hypotheticals, but I assume, put Hatch-Waxman aside, I assume if I have a patent and I see somebody else, my business competitor, start manufacturing, and that manufacturer swears on a stack of Bibles that they're just manufacturing. It's just something they do out of- it's like a hobby of theirs. They're not going to sell to anybody. I would think with absolute certainty that I have Article III standing as the patent holder to enjoin them because the very act of manufacturing in violation of my patent is an Article III injury. You may disagree with me, but I think I'm right about that. Paragraph IV certification contains an assertion that the patent is invalid, right? Yes. And I assume that any respectable corporation would have to list that as a material event for purposes of their SEC filings, right? Because it would arguably impact the value of those property rights. I mean, I think that's right. I mean, I don't want to pass myself off as an expert on 10-K filings, but that seems right to me. It seems even more right that regardless of the security disclosures, there is an injury in fact for Article III purposes that takes place at the point of the declaration of invalidity or the point of manufacture, and it just- I don't think it's right that absent a contemplated future sale that there is no Article III injury, and therefore you have to trace down where the sale may take place. So that was really the first point. The second point I wanted to make was just simply, you know, as I predicted, I think Mr. Olson, I think, moved on to general jurisdiction quite quickly because I do think he has a problem. I listened to what he said in terms of the litigation-related contacts that the defendant has with Delaware, and what I heard was the registration to do business and litigation in the forum. Those are the two other things I heard besides the fact that we sent the statutorily required letter to New York to a company that was based in Delaware. Now, neither of those two things is litigation-related contact. We registered to do business, but that is not the way, and, you know, I don't think there are allegations in this. In theory, you could get into jurisdictional discovery on this point, but I don't think it's really disputed. The registration to do business there is not what gives rise to the injury here. I doubt that if we ever got to the point of distributing this product there, it would really be through the activities that we registered for, but that's a question that if you really wanted to, you could get into. Do you see any daylight between the due process consent analysis and an unconstitutional conditions analysis? No, I don't, which is why I don't think we've waived anything. I just think they're two sides of the same coin. They're two ways of looking at the same issue. So if I just mention, because I want to get to general jurisdiction, I did want to get on the table. The other thing that they point to is litigation that we've initiated in Delaware. Again, I can't think of anything that's less related to this litigation, which is the test under specific personal jurisdiction, and I would add that what you really have in terms of our initiated litigation is four suits, each one of which at least one of the defendants was a Delaware corporation. So all it shows is that we know what personal jurisdiction is and we know where to sue people, which is where they're at home. You sue corporations where they're at home, at least if you're relying on general jurisdiction. To bring me to that, I'm going to get a chance to say more about this, but the one thing I really do think it's important to recognize is that this whole issue doesn't get away just by sort of a clever kind of misuse of the word consent. Because of course we concede, and of course Justice Ginsburg in her decision in Daimler concedes, and of course Goodyear concedes, that somebody can still consent to jurisdiction. So the cases talk about the situation where the only situation that's relevant for a specific or a general jurisdiction question is when you have a defendant who has not consented. But consent, and at various points both other parties make this clear, consent is a voluntary concept. And the only thing voluntary that my client has done is engage in the modicum of business that is necessary for you to then be required by Delaware to register and then be required to appoint an agent for service of process. But given that the penalties are so minimal in Delaware as opposed to what the Supreme Court was looking at in Bendix, you certainly had the option to not consent. I don't think we did if we wanted to be in compliance with Delaware law. Delaware law does not say register or not. If you decide not to register, that's totally fine. You just have to pay $500 as you go. That's not the way the statute is written. The statute is written as if you do business in Delaware, you must register. And then of course it deals with the consequences of registering and the consequences of not registering. And with all due respect, I don't think the analysis here turns on whether the penalty for not registering is $500 or $500 million. I mean, I don't think either way it is an obligatory statutory requirement that we register. If that's the case, though, why is it that in Bendix case the Supreme Court didn't just simply say you can't ever force anyone to register as opposed to saying let's look at the level of the burden that's imposed by the registration requirement? Because in that case they had a Dormant Commerce Clause challenge teed up for them and not a Due Process Clause challenge. I mean, I'll sort of grant you that sort of the premise of that case is well, there are real consequences if you register, but they didn't have an attack on that. So I really think that's your answer there. And I think there is a reason there, which is I think it was easier to conceptualize. You read those opinions. I think the court thought it was doing pike balancing, but I think it's easier to conceptualize what was going on there as being facially discriminatory compared to the situation that you have here. I think you could try to make a Commerce Clause violation here, but we've really focused the court's attention on the Due Process Clause. The other aspect of this, of course, is what to do with the Pennoyer-era Supreme Court case, but I'm happy to talk about that in the second case if it pleases the court. Okay, so let's close out this case. Thank you. Thank you both. This number 15-1456 is taken under submission.